[No. 6616.]

## City of Leadville et al. v. The Leadville Sewer Company.

1. **Appeal—Judgment—When Final** — Plaintiff, claiming authority from the city, had constructed sewers in the streets and for many years operated them for its own profit, claiming tolls from those making connections therewith and enforcing collections summarily if the tolls were not paid. The city, by resolution of its council, had afterwards revoked all licenses and permits under which plaintiff was assuming to act, and the district attorney, at the instance of the city, had instituted proceedings in quo warranto to test plaintiff's right. Plaintiff thereupon applied for and obtained an injunction, afterwards made perpetual, restraining the city and its officers from interfering with it in excavating in the streets to repair or cleanse the sewers, or disconnecting private consumers who refused to pay the agreed tolls, or in any manner interfering with plaintiff in the operation of the sewer. It was expressly declared, in the decree, that the injunction should not be taken to interfere with the rights of the parties in the proceedings in quo warranto. Held, a final decree, and that an appeal lay.—(127)

2. **Franchises—Special Privileges—Perpetual Grant**—Under sec. 11 of the Bill of Rights (Const., art. II), no perpetual franchise or special privilege can be granted.—(131)

3. **Municipal Corporations — Contracts — Ultra Vires** — The doctrine that both parties to a contract which is ultra vires as

to one of them are in pari delicto, has no application to a municipal corporation.—(131)

**4. Estoppel—Municipal Corporations**—A municipal corporation is not, by a long acquiescence in the exercise of a power or privilege which it had no power to grant in the first instance, estopped to deny the existence of such a power or privilege or prohibit its exercise.—(132)

**5. Injunctions—Municipal Corporations**—A court of equity should not interfere with the officials of a city in efforts directed to the preservation of the public health, unless the right of the applicant is free from doubt, and then only in an extreme and exceptional case.—(128)

Plaintiff having laid a system of sewers in the streets of the city, under claim of a license from the city so to do, the city council afterwards adopted a resolution revoking the supposed license, and prohibiting plaintiff from excavating in the streets for any purpose, or charging any of the inhabitants for sewer connections or service. The city officials afterwards prevented an excavation in the streets, attempted by plaintiff, to remove obstructions in the sewer, itself doing the work, offering and proposing to plaintiff to keep the sewers in repair at its own expense, employing for that purpose the servants of the plaintiff, pending a proceeding in quo warranto which had been instituted to test the plaintiff's rights, and in case it should be adjudged the owner of the sewer system, bear all such expense. Plaintiff rejected this offer and brought its action against the city, the mayor and other officials, to restrain interference with it in excavating in the streets in order to cleanse or repair the sewer, or disconnect private consumers who were delinquent in the payment of tolls for sewer service. None of those whose premises were connected with the sewer were made parties. There was no averment that any of these had consented that the connection should be severed upon nonpayment of the tolls; the city had never given any such consent; and there was no contract whatever between the city and the plaintiff. In granting the alleged license, the city received nothing, and plaintiff promised nothing. There was no sufficient evidence that the city was not able to respond in damages, no evidence whatever of the insolvency of the officials whose conduct was complained of, and no sufficient showing of irreparable damage. The city disclaimed any intention to destroy the property, or to do anything except to maintain its sanitary condition, pending the proceedings in quo warranto. There was no evidence that any one enjoying sewer service was insolvent or had refused to pay

sewer rates upon any ground except that the plaintiff had no rights to exact them, and it was further made to appear that contagious and infectious diseases were prevalent in the city, and that to allow disconnections with the sewer which plaintiff was threatening, would endanger the health of the whole community. Held, that the case was not one entitling plaintiff to the injunction prayed; that a court of equity was justified only in retaining the status quo during the pendency of the proceedings in quo warranto. The injunction awarded by the district court, as mentioned in the first point of the syllabus, was modified, so that the city was enjoined from assuming possession of the sewer system, operating it or claiming revenue from it, removing or destroying it, or in any manner interfering with it, except to regulate its operation for the public health; and the plaintiff was enjoined from disconnecting any user for the purpose of enforcing collections, and from making excavations in the streets except when necessary to preserve the system as a going plant, and then only under reasonable regulations imposed by the city authorities.—(130-138)

Bailey, J., expressing no opinion upon the legal questions involved, concurred in the majority opinion, upon the sole ground that the bill was in a sense ancillary to the proceeding in quo warranto, and that, pending the final disposition of that proceeding, it was the right and duty of the municipal authorities to regulate the operation of all sewers, whether public or private, in the interests of the public health.—(140)

White, J., concurred in the modification of the injunction upon the ground that the decree being final, if the proceeding in quo warranto should be dismissed, the city would be remediless, and that it was the duty of the municipality, and within its powers, to control the use of its streets and the operation of sewers, whether public or private. He expressed no opinion as to the title to the sewer system or the rights of the parties therein.—(139)

Musser, J., concurred in the conclusion upon the ground that the plaintiff was without right in law to operate a sewer, excavate in the public streets, or compel the collection of sewer charges (citing and approving Weaver v. Canon Sewer Company, 18 Col. App. 242); that nowhere in the statutes can be found any warrant in law for a city or a town to confer upon private persons the right to construct and operate a sewer system and charge and collect for the service; that the plaintiff had gained no right by estoppel; that the title to the plant might and should be determined in the proceeding in quo warranto; that the court

in that proceeding could and should afford the plaintiff ample protection; that to allow plaintiff to disconnect from the sewer those refusing to pay sewer charges as allowed by the decree, would manifestly injure the public health, and that it accords with good sense and sound morals to preserve the status quo until the final determination of the controversy.—(143)

*Appeal from Lake District Court*—Hon. GEORGE. W. ALLEN, Judge.

Mr. JOHN A. RUSH, and Mr. WILLIAM R. KENNEDY, for appellant.

Mr. JOHN A. EWING, and Mr. CHARLES J. HUGHES, Jr., for appellee.

Mr. MILTON SMITH, and Mr. CHARLES R. BROCK, *amici curiae.*

Mr. JUSTICE HILL delivered the opinion of the court:

It appears that there were no sewers in the city of Leadville prior to the year 1886, at which time the appellee was incorporated under the laws of Colorado with a capital stock of $10,000.00. Its objects as set forth in its articles of incorporation were, "to construct, own, operate and maintain sewers and drains for sewer purposes in and about the city of Leadville,  *  *  *." Its corporate existence was fixed at twenty years.

August 5, 1886, appellee applied to the city council of Leadville for permission to run and operate sewers through certain streets and alleys of the city. Pursuant to said application, the city council, by motion, granted, or attempted to grant, the permission prayed for, and, thereafter, relying upon this permission, appellee constructed a sewer system in some of the streets and alleys of the city, and sundry properties were connected with it upon the payment of certain rates fixed by the appellee. It appears that

at that time the stockholders, or most of them, were property owners, and the same rate was charged them as others.

At four different times thereafter (the last being in 1891) the appellee applied to and received from the city council permission to, and did, construct and extend sewers upon other streets and alleys, and ultimately the system covered a number of streets and alleys, principally in the business section, and numerous citizens connected their properties, and paid the rates prescribed by the sewer company.

No ordinance was passed granting or attempting to grant to the appellee any franchise, and the only right it had (if any), for its use of the streets and alleys was secured through the permits, which were indefinite as to time. The only evidence on the subject is the records of the city, which, as to the first permit states:

"A petition of The Leadville Sewer Company asking permission to run and operate a sewer was read    *    *    *.

"On motion    *    *    *    the petition was granted on condition that the work be prosecuted under the direction of the committee on streets,    *    *    *.    Motion carried."

The permits for extensions were similar. The only ordinances enacted concerning the subject were those regulating the method by which the streets and alleys might be excavated for the laying or repairing of water, sewer and other pipes.

Up to the time of this trial no other sewer system of any consequence was provided and a large portion of the city was without sewers.

When the corporate existence of the appellee expired in 1906, renewal certificates were made by its officers for another twenty years; and it continued to operate and maintain its system, without objection by

the city, until February 11, 1908, when the city council, at a regular meeting, passed the following resolution:

"Resolved, by the City Council of the City of Leadville, that all permits or licenses of every kind and character heretofore granted to the Leadville Sewer Company be and the same are hereby revoked, set aside and annulled, and, further, that the said The Leadville Sewer Company shall not be permitted to make any excavation of any kind in any of the streets, alleys or public places of the City of Leadville for any purpose, nor shall said Company be permitted to charge any inhabitants of said City for any sewer connection or service as this City does not recognize in any manner any rights of any kind in the said The Leadville Sewer Company in or to any sewer in said City, or in or to any charges for the use of the same, but hereby expressly repudiates the same."

Thereafter, and until the bringing of this action, the appellee ceased to excavate in the streets and alleys for the purpose of disconnecting consumers, although some of its patrons refused to make further payment for the use of the sewers.

In March, 1908, a *quo warranto* suit was instituted in the district court of Lake county, by the district attorney, to test the rights of the appellee to continue its operation in the streets and alleys of the city, and to determine the property right to the sewer pipes. The claim was that the appellee was exercising these rights without due warrant or authority of law, it having no such rights and never having had. The sewer pipes, being a part of the realty, were not the property of the appellee; but belonged to the city for the use and benefit of its inhabitants. The *quo warranto* suit is still pending and undetermined. Matters thus dragged along until on or about May 28, 1908, when the main sewer on Harrison avenue

(the principal street of the city) became clogged and it was contended by the city that its condition thus became a menace to the health of its inhabitants. The appellee took no steps to remove the same until June 1st, when it commenced to excavate in the street for that purpose, but was prevented from finishing by the officers of the city, who, at the expense of the city, employed men to excavate and remove the clog and repair the sewers, which was done without injury or expense to the appellee, and the work was finished prior to the issuance of the temporary restraining order in this action.   The city disclaimed any intention of doing anything to injure or damage the sewers, but proposed to continue the enforcement of its resolution in prohibiting the appellee from excavating in the streets of the city.

In making the repairs, it appears the city requested the agents of the appellee to furnish the materials, which they refused to do.   Also, the city, through its officials, offered and agreed with the appellee to enter into an agreement in substance that in case of any stoppage, breakage or leakage in the pipes, thereafter, they should be repaired under the direction of the mayor, the men who were then employed by the appellee to have the preference, if they desired, in performing such services, and in case the sewers should be adjudged to be the property of the city, it to pay the entire expense of such labor; neither party to waive any rights in the *quo warranto* action on account of such agreement.   The object evidently being to prevent anything from happening which would endanger the public health.   But the appellee declined and instituted this suit against the city, Mr. Rose (its mayor) and other officials, to restrain it and them from interfering or hindering it in its work of excavating in the streets and alleys for the purpose of removing any stoppage in its sewer

pipes, or for the purpose of cutting off and disconnecting private consumers who refused or neglected to pay, or from interfering in any manner in its operation of the sewers or sewer pipes, etc.

In its answer the city denied the appellee's right to continue the operation of its plant; claimed it was a trespasser in the streets; plead the pendency of the *quo warranto* suit to test its right to continue, and the prayer therein that the sewers be decreed to be the property of the city, which action was undetermined; claimed that the appellee and its agents were attempting to defeat a trial of that cause; declared their intention, in order to protect the public health, to continue, unless enjoined, to prevent the appellee from excavating in the streets and alleys; claimed that appellee had notice of the resolution of February 11th, and that it complied therewith until June 1, 1908, and, substantially set forth the facts as hereinbefore stated.   Decree was rendered in favor of the plaintiff with a perpetual injunction as prayed, with a proviso that it should not be taken to interfere with the adjudication of any rights as between any or either of the parties in the *quo warranto* suit then pending; from which judgment the city and its officials have appealed to this court.

It is contended by the appellants that the appellee had no right to continue, or any lawful authority to perform any of the acts which it had performed in the past, and, in any event such an extreme and exceptional case is not presented as calls for the interference of a court of equity.   They contend that the case of *Weaver et al. v. The Canon Sewer Co.*, 18 Col. App. 242, is controlling, wherein it is held that subdivision 10 of § 4403, Mills' Ann. Stats., having empowered municipal corporations to construct sewers and to regulate their use, and having provided a method by which the cost of their construction may be

defrayed, this mode must be followed; ownership and control, except in the municipality, would be inconsistent with its terms, and an ordinance attempting to do otherwise was void. They further contend that as the appellee had no lawful right at any time to place any of its pipes in the streets and alleys of the city, or operate sewers therein, as under our statutes no such right could be conferred upon it, it was at all times a trespasser, and upon account thereof the sewer pipes became a part of the realty and are the property of the city for the use and benefit of its inhabitants.

It is contended by the appellee, first, that under the seventh subdivision of the seventh power of § 4403 of Mills' Annotated Statutes the power exists in the city council to grant the permits under which it operates; that the *Weaver case, supra,* being a construction of the tenth subdivision only, did not undertake to construe the other subdivisions; that if it did there would only be a defective power in the city to make the grant; that in such case the corporation having made it should be bound by it, having the benefit and having induced a party, relying on its promise, to spend money and perform its part by the execution of its contract, and to continue to do so for many years; that a court of equity may mold its decree to the same and under like conditions, and that the city should be estopped from attempting to interfere with this right. The further contention is made, that the sewer is a private system, constructed principally for the benefit of its stockholders, in that all use is allowed by contract only; that no effort is made to force any one to connect with it, and that for these reasons it is not prohibited by the statutes; that it has an absolute right to continue the operation of its plant in the streets and alleys of the city, and to excavate therein for the purpose of making repairs,

as well as to disconnect all users who refuse to pay the schedule rates for such service.

The judgment in this case was final. The parties to it are different from those to the *quo warranto* suit, and, according to the language of the judgment here, it is to remain in force forever with the one proviso "that it shall not be taken to interfere with the trial or adjudication of any rights between the parties hereto in the *quo warranto* action."

The appellee, plaintiff in this suit, did not mention in its petition the existence of the *quo warranto* suit. The prayer was for a recognition of its alleged legal rights, and for an injunction allowing it to continue operating its plant in the streets and alleys of the city in the manner desired by it, perpetually. We know of no way that the appellants could have this judgment reviewed other than by appeal from it, or by writ of error. If it was intended to be purely interlocutory, and only reviewable in connection with the final judgment in the *quo warranto* action, to which the city and other appellants were not parties, and had the appellee so desired, it was its duty to have asked the court to have brought into that case all necessary parties, and having all the parties in the suit in which the final judgment was to be entered, there to have secured such temporary relief as it was entitled to, instead of bringing this suit. Not having done so, we do not think it can be heard to complain of a review of the final judgment in this action.

In *Vickery v. Wilson et al.*, 40 Colo. 490, it was held that the legislature, by the enactment of sec. 289 of our Civil Code, provided a special remedy by which the validity of a franchise may be tested (if any is in dispute); the appellants having plead and the record fully showing the pendency of such an action undetermined. The only questions necessary

to be determined here, in order not to encroach upon the questions involved in the *quo warranto* suit, is, was the appellee entitled, in an equitable proceeding (instituted after the pendency of the *quo warranto* suit) to have the city and its officials restrained from preventing the appellee from excavating in the streets and alleys of the city for the purpose of enforcing payment by its patrons for the use of its sewer service, or for the purposes of keeping the sewers in proper repair as a going plant, by the allegations in its pleadings that the city was bankrupt (though no such claim was made against the individual defendants) and that appellee would be put to a multiplicity of suits, would suffer irreparable damage, etc.?

The authorities seem to concur in saying that a writ of injunction should never be issued against a municipal corporation unless the right and power are free from doubt, *Denver City Ry. Co. v. Denver,* 2 Col. App. 34, and that courts of equity will not usually exercise jurisdiction in case of private nuisance or disturbance of easements, where the right of the claimant is disputed and is not clear, until he has established his claim in an action at law.—*Rhea v. Forsyth,* 37 Pa. St. 504.

In the case of *Adams et al. v. Cronin,* 29 Colo. 488, which involved the enforcement of a city ordinance concerning intoxicating liquors, this court held, "that only in extreme and exceptional cases should a court of equity interfere with municipal authorities in the enforcement of such ordinances." The conclusion must follow that a court of equity should not interfere with the officials of a city in their alleged efforts to protect the public health, except where the right of the applicant is free from doubt, and then only in an extreme and exceptional case. Hence, was the right and power of the appellee to

excavate in the streets and alleys of Leadville, *for
the purpose of disconnecting patrons who refuse to
pay for such service,* free from doubt (it not having
been established in an action at law) and if it was,
did it present such an extreme and exceptional case
that a court of equity should interfere? The city
.claims the digging up of its streets to disconnect
private citizens from the further use of such sewer
pipes endangers the public health. It also claims
the appellee failed to repair its main sewer when it
became clogged, which was the reason it proceeded
to make such repairs.

The record shows that the city offered to allow
appellee's employees, under the supervision of the
mayor, to keep the sewers in repair pending the final
disposition of the *quo warranto* suit and in case the
city was successful in securing title to the sewers it
was to bear the total of such expense.

Waiving any expressions upon the matters tri-
able in the *quo warranto* action, or what was or was
not decided in the *Weaver case, supra,* or what con-
struction is proper to be given to the sundry sections
of the statute affecting the alleged rights of the ap-
pellee, or whether the sewer is a private or public
one, it must be conceded that under the forty-eighth
subdivision of § 4403, Mills' Ann. Stats., the city has
the right, as there stated, "to do all acts and make
all regulations which may be necessary or expedient
for the promotion of health or the suppression of
disease," and that both the seventh and tenth sub-
divisions of said sec. 4403 reserve to the city the
right to regulate the openings in the streets and
alleys for the laying, building and repairing of sewer
pipes, which reservations, together with its power to
protect the public health, as well as its general con-
trol over its streets and alleys, considering the fact
that there was no other sewer to connect with, thus

(9)

the necessity for the protection of the public health, certainly gave to the city the right, temporarily at least, to prevent the digging up of its streets and alleys to disconnect private users who refused to pay during the pendency of the *quo warranto* suit, regardless of who is right in that action, and this record does not present such an extreme and exceptional case as calls for the interference of a court of equity in that respect, and it was not justified in granting a mandatory injunction allowing the appellee to dig up its streets and alleys for the purpose of enforcing such collections.

No contractual relation between the appellee and its patrons is involved here; they are not parties to the suit and there is nothing in the record which shows there were any contracts or ever had been between the appellee and any of its patrons whereby they consented to allow their sewerage connection to be cut off upon the nonpayment of rent, and no such contention is made by the appellee that any such contracts existed, or that there was any understanding to that effect, and there is no expressed or implied assumption that the city, by contract or otherwise, ever consented or agreed at any time to allow any consumers to be disconnected in its streets or alleys which would be injurious or detrimental to the public health. In fact, the record shows that there was no contract at all between the appellee and the city concerning these matters. By granting the permit to construct the sewers, the city received nothing, the appellee promised nothing. After the permits were granted, the appellee having made no promise or agreement, need not have constructed any sewers at all; while the plea of estoppel, if sustained, would entitle the appellee to all the privileges of a perpetual franchise (including the perpetual right of digging up the streets to disconnect consumers) ; rights which

the legislature itself could not grant, being contrary to the provisions of art. 2, § 11, of our bill of rights, which provides, ''that no  *  *  *  law  *  *  *  making any irrevocable grant of special privileges, franchises or immunities, shall be passed by the General Assembly.''

It is true as held in former cases of this court, the last being that of *Colorado Springs v. Colorado City,* 42 Colo. 75, that as applied to contractual rights estoppel applies to a municipality with the same force and effect that it does to individuals; but this is limited to cases in which the city had the right to make the contract in the first instance, and in the case just cited it was expressly held ''it was within the power of Colorado Springs to make such a contract, and her plea of *ultra vires* must be rejected.'' But no case in this court, as we understand, goes to the extent of holding that the rule that both parties to an *ultra vires* contract are in *pari delicto,* applies to municipal corporations, but the rulings in this jurisdiction have always been to the contrary.— *Town of Durango v. Pennington,* 8 Colo. 257; *Smith Canal or Ditch Co. v. City of Denver,* 20 Colo. 84; *Sauer v. The Town of Gillett et al.,* 20 Col. App. 365; *Sullivan et al. v. City of Leadville,* 11 Colo. 483; *The People ex rel. v. May,* 9 Colo. 80.

If the rule were otherwise then all statutory and constitutional restrictions upon the authority of municipal officials could, under certain conditions, be avoided by the plea of estoppel.  The former rulings of this court appear to have received the approval of the great weight of authorities.—*State ex rel. v. Murphy,* 31 S. W. (Mo.) 784; *Trester v. City of Sheboygan,* 58 N. W. (Wis.) 747; *Dullanty v. Town of Vaughn,* 45 N. W. (Wis.) 1128; *Cedar Rapids Water Co. v. City of Cedar Rapids,* 90 N. W. (Ia.) 746; *Bangor Township et al. v. Bay City Co.,*

110 N. W. (Mich.) 490; *Packard v. Hayes et al.,* 51 Atl. (Md.) 32; *City of Eufaula v. McNab,* 67 Ala. 588; *Logansport Ry. Co. v. City of Logansport,* 114 Fed. 688; *Davis v. The Mayor, etc., of New York,* 14 N. Y. 506; *Ashland v. C. & N. W. Ry. Co.,* 105 Wis. 398; *Cleveland v. Cleveland Ry. Co. et al.,* 93 Fed. 113; *Underground R. R. Co. v. City of New York,* 116 Fed. 952; *Rice v. C. B. & N. Ry. Co.,* 30 Ill. App. 481; *Commonwealth v. Erie R. R. Co.,* 27 Pa. St. 339.

It follows that the city council, in the first instance, having no authority to grant such permission for the disconnection of private consumers to the injury of the public health, no act of its officials by acquiescence therein for a great many years, or otherwise, will estop it from denying to the appellee the right to continue the use and enjoyment of such a privilege.

'Tis true, some citizens refused to pay, but serious contentions existed. The city claims ownership to the property for the use of its inhabitants; it claims the appellee had no right to continue its use, and in this claim it appears to have the support of our court of appeals in the *Weaver case, supra,* if applicable.

A *quo warranto* suit had been instituted; the feeling was evidently bitter. Under these conditions a court of equity was not justified in doing anything further than preventing a destruction of the property and keeping matters in *statu quo* during the pendency of the other action. We think the requirements of the city that the repairs be made under the supervision of the mayor, or any other officer to be selected by it, a reasonable regulation under the conditions shown to exist here.

'Tis true, it is claimed that the city, by the passage of the resolution and by the actions of its officials, caused a large number of appellee's patrons

to discontinue payment and without the right to dis-
connect them it would result in irreparable damage
to appellee, a multiplicity of suits, etc. The only
evidence to that effect, other than the passage of the
resolution, being the evidence of the vice-president
and general manager of appellee, who testified that
he recently asked four property owners for rent and
the substance of the conversation was they said
"city was going to protect them and they would not
pay." No evidence was offered to show that any
of the appellants, the officials of the city who com-
mitted the acts complained of, were insolvent, and
the evidence offered as to the city's financial condi-
tion was insufficient to show that it could not respond
in damages for any temporary loss occasioned to
the appellee, if it is right in its contention that
it had a lawful right to continue its use and en-
joyment of the streets, which it would be com-
pelled to establish before it could recover as against
the city, and the showing made was certainly insuffi-
cient to establish any irreparable damages, and not
sufficient under any line of reasoning to overcome
the city's duty to protect the public health of its
inhabitants.

The actions of the city in the passage of the
resolution and its attempts to enforce it could in no
way prevent the appellee from instituting suits
against its patrons for the enforcement of all legal
rights (if any) which it had under its contracts. The
effect of preventing it temporarily from disconnect-
ing private consumers in the streets and alleys of the
city for sanitary purposes is not the taking of prop-
erty without due process of law, but is simply de-
claring the manner in which it shall operate and
maintain this property in the streets and alleys, which
unquestionably belong to the city; the only right
claimed by the appellee is a privilege or easement to

enjoy the use of its property (to wit, its sewer pipes) in the streets and alleys, which privilege had never yet been sanctioned by the dignity of an ordinance. That a man can do with his property as he pleases at all times is subject to many qualifications, in all civilized nations. Inasmuch as the city disclaims any intention of attempting any destruction of the property, or of doing anything more than that which would be necessary to maintain its sanitary condition during the pendency of the *quo warranto* suit, such act could not affect the rights of the appellee upon its contracts, if they were otherwise enforceable.

No evidence was offered tending to show that any patron of the appellee was insolvent, unable to pay or refused to pay for any other reason than that the appellee had no right under the law to continue to operate its plant and collect revenue therefor in the city, which position was also taken and sanctioned by the city, relying upon the ruling in the *Weaver case, supra,* decided by our court of appeals. Suppose the contention was upon the rate question and a large number of citizens refused to pay the rates demanded, claiming they were prohibitive, yet that upon account of sanitary conditions it was necessary that their properties have the use of the sewers, would any court hesitate in such a case, pending a determination of that question under proper conditions, to prevent such disconnection until the matter was finally disposed of?

Besides, one of the most forceable arguments presented by counsel for appellee in justification of the original construction of this sewer by a private corporation, in the manner it was done, as well as its future maintenance under these conditions, was the great necessity for the protection of the public health and that it was necessary to have connected with this sewer system some of the very properties

which it is now seeking to disconnect, over the protest of the officials of the city, and which the injunction granted to it by the lower court expressly allowed it to do for an indefinite period in the future, or at least until the rights of the parties are determined in the *quo warranto* proceeding, which suit, although instituted prior to the bringing of this action, it was admitted at the time of the first oral argument here of this cause was not then at issue in the lower court, but pending a settlement of the pleadings; which action it is to be regretted could not have been speedily tried soon after its institution so as to have avoided any danger to the public health or delay in the disposition of the important questions therein involved.

It is proper to state that prior to the apparent truce in connection with this matter, since the records were lodged in this court pending a hearing upon an application to modify the injunction, which was filed here December 12, 1908, it was alleged in that application and stands undisputed that the appellee was then actively engaged in disconnecting and attempting to disconnect the laterals of about seventy private consumers from the main sewer system, so that the persons thus cut off and their premises are, and would be, left without any sewer facilities. It is not necessary for this court to be told, under such conditions in a city like Leadville, considering its location, etc., that the result would thereby endanger not only the health of the persons so cut off, but also, to a great extent, the health of the inhabitants of the entire city.

It was also alleged and supported by affidavits, which stand undisputed, that there then existed in the city of Leadville contagious and infectious diseases which would be, and are, encouraged in their spread by the unsanitary conditions which would

occur by the actions of the appellee if allowed to continue in the disconnection of such inhabitants and in prohibiting those disconnected from being reconnected.

It was further alleged and stands uncontradicted, that since the rendition of said decree, without securing permits from the mayor and city council as by ordinance required, the appellee began to dig up the streets and make excavations therein in violation of the terms of the ordinances of said city for the purpose of disconnecting certain users of the sewers under the claim that the decree and injunction issued in the above entitled cause gave it the right and power so to do.

It is proper to state further that since this action was lodged in this court its files show that on or about December 12, 1908, the state of Colorado and the state board of health, through the then attorney general, appeared in this behalf and called the attention of this court to the threatened unsanitary condition of the city of Leadville on account of the controversy involved herein and that the same became and was a menace to the public health of that city, and they joined in the request that time be shortened for briefs and that the case be advanced to the earliest possible hearing and determination.

The record further shows that on March 4, 1909, the state of Colorado and the state board of health, by the then attorney general, for the reasons above stated, again appeared and joined in the request and motion that the cause be advanced to a speedy hearing. So that in addition to the officials of the city we have these departments of the state at two different times, through two attorneys general, appearing and praying for a speedy determination of the controversy upon account of the sanitary conditions at

Leadville and the great danger threatening the public health there.

We do not understand it to be the intention of the city to assume jurisdiction and ownership over this property at this time for the purposes of collecting the revenues to be derived from its use, or that there is any serious contention involved necessary to be determined here, other than the right of the city to prevent the digging up of its streets and alleys by the appellee, for the purpose of disconnecting private users in order to enforce its collections. But the record discloses that the city refused to allow the appellee to complete its repairs to the sewer pipes after it had begun them, although they were finished by the city prior to the issuance of the temporary restraining order.

However, the resolution passed by the city council in effect denies to the appellee the right to make any excavation for any purpose for repairs, or to keep it in a sanitary condition, even pending the disposition of the *quo warranto* suit. The appellee has been operating the plant for a long time, a portion of it for about twenty-two years, with the knowledge and consent of the city, which recognized there was a difference of opinion existing between the parties as to both the law and the facts by having caused to be instituted the *quo warranto* action to have the alleged rights of the appellee declared void, and wherein the city lays claim to the pipes and the right to their future use. Under such circumstances, assuming the city is right in its entire contention (regarding which no expression is intended to be given here), having caused the *quo warranto* proceeding to be instituted it would not now be justified in taking possession of the property by force for the purpose of its operation, and was not justified in attempting to prevent the appellee from keeping it in

repair (under proper regulations) during the pendency of the *quo warranto* suit which it had instituted to test this right, among other things, even though it was willing to do this work itself, unless the appellee continued to fail to do so to the extent of endangering the public health.

For the reasons stated the judgment will be reversed in part, modified and extended as follows:

To the end, therefore, that this property, and the present relations thereto of the parties now engaged in controversy over it, shall, as nearly as possible, be held in *statu quo,* it is ordered that the injunction heretofore issued in this cause be modified as to the appellant, the City of Leadville, and extended to the appellee, The Leadville Sewer Company, in the manner hereinafter provided, until the rights of the respective parties concerning the property be finally determined, in the *quo warranto* suit now pending for that purpose in the district court of Lake county, or in some other appropriate action; that is to say, it is ordered that the said the City of Leadville be, and it hereby is, restrained and enjoined from taking or attempting to take jurisdiction over or possession of said property, or of any part or portion thereof, for the purpose of operating the same and collecting revenue therefrom, and from removing or destroying the same, or in any way interfering with said company in its operation thereof, except to regulate the manner of such operation for the protection of the public health; that said sewer company be, and it hereby is, restrained from disconnecting any user of the sewers for the purpose of enforcing rent collections; that it also be, and hereby is, restrained from making any excavations or openings in the streets or alleys of the city in connection with the operation and conduct of the sewers, except where it is necessary to be done to repair, maintain and preserve it

as a going plant, and then only under such reasonable regulations as may be imposed by the city authorities for the protection and preservation of the public health.

It is further ordered that the appellee pay the costs of this appeal and that each party pay its own costs in the trial court.

*Reversed in part, modified and extended.*

Decision *en banc* ·

Mr. Justice White and Mr. Justice Bailey concur specially in the final order.

Mr. Justice Campbell and Mr. Justice Gabbert dissent. ————————

Mr. Justice White :

I concur in the conclusions reached by the majority of the court modifying the injunction, but express no opinion upon the ownership of the sewer system of Leadville, or the rights of the respective parties thereto. An action in the nature of *quo warranto* is now pending to determine those matters, and this action, were it not for the parties to, and the permanency of the injunctive order, might be regarded as ancillary to that proceeding. Under the nature of the injunctive order, however, if the *quo warranto* proceedings were dismissed for any reason, the city would be helpless, and, therefore, I consider the judgment in this case final in its nature.

By statutory enactment the city has the power to establish streets; to regulate the use of the same; to regulate the openings therein for the building and repairing of sewers; to regulate the construction, repairs and use of sewers and to do all acts and make all regulations which may be necessary or expedient for the promotion of health or the suppression of disease.—Ch. 147, R. S. 1908.

Ample authority is given under the statute to

carry these powers into effect, and it becomes the duty of the city authorities by proper requirements to regulate and control the use of its streets, the operation of sewers, whether public or private, and to safeguard and promote the public health. In the establishment and enforcement of reasonable rules and regulations, in exercising such rights and performing such duties, courts of equity cannot interfere, and the modification of the injunction is proper.

Mr. JUSTICE BAILEY specially concurring:

Since there is an action pending, for the express purpose of having the respective rights of the parties in interest to the property here in controversy determined, this action may properly be regarded as, in a sense, ancillary to the former, and one in which the real legal questions at issue may not be properly settled. It should be treated, in effect, as an action simply to preserve the *status quo,* pending a final disposition of the other suit.

Solely, therefore, upon the assumption that the public health is involved, which seems clearly to be the fact, from the whole record, and that by statute it is not only made the right, but the duty of the city authorities, by proper requirements, to regulate the operation of sewers, whether public or private, I concur in the conclusion reached by the majority of the court for a modification of the injunction, to be in force until final decision in the main case. I express no opinion upon the legal questions involved, and concur in the final order made, as above indicated, for the reasons here stated only.

Mr. JUSTICE MUSSER specially concurring in the conclusion and judgment of the court:

I concur in the conclusion and judgment announced by this court for the following reasons:

The city caused the *quo warranto* proceedings to be brought, to test the right of the sewer company in its streets and alleys, and to determine the ownership of the pipes now laid in the ground.

It is proper, therefore, to require it to abide the result of the *quo warranto* action which it caused to be initiated, so far as the preservation of the public health and the good order and welfare of the city will permit.

The sewer company brought this action for purely injunctive relief, basing its right to such relief upon the ground that it had rights in the streets and alleys which were being unlawfully invaded. It made no mention of the *quo warranto* action in its complaint, but invoked the jurisdiction of the court, and sought the protection of its injunctive power, to protect it from what it alleges was the unlawful invasion of lawful rights. It has thus squarely and unequivocally demanded that in this action should be determined what its rights are, or whether it has any rights, in the streets and alleys of Leadville. This issue, made by the company itself, should be squarely met and determined now. When determined, it will be found that the sewer company has no right in law to operate a sewer, or to dig up the streets and alleys, or to compel the collection of sewer charges in the city of Leadville.

It has been determined in this state, in the case of *Weaver v. Canon Sewer Company*, 18 Col. App. 242, that city councils, under the general law, have no power to grant a right or franchise to any private person or corporation, to operate a sewer within the city limits and collect charges for the use of the same. The reasoning of that case is supported by authority, and in my judgment is the law. In that case reference is particularly made to subdiv. 10 of sec. 4403,

Mills' Ann. Stats. If we look at other sections of our statute, the decision of the court of appeals becomes stronger. Subdiv. 7 of the same section provides that a municipality shall have power to regulate the openings in its streets for the laying out of gas or water mains, and the piping, building and repairing of sewers, tunnels and drains, and erecting gas lights. This is immediately followed by a provision that private individuals may have the right, with the consent of the city council or town trustees, to erect gas factories, and lay down pipes in the streets or alleys in the city or town. The grant of this privilege to gas companies alone, in this section, excludes the granting of it for sewers. The 60th subdivision of the same section, in 3 Mills' Rev. Sup., gives the power to permit steam or street railroads to operate its cars in the city upon consent of the owners of one-half of the frontage. Subdivs. 67 and 69, 3 Mills', gives the power to grant to private individuals or corporations, the right to build and operate water, gas, or electric light works and to charge and collect for water, gas or electric light. Nowhere in the statutes can be found any warrant of law for a city or town to grant to a sewer company the right to construct and operate a sewer system and to charge and collect for the use thereof. Time will not permit the citation and examination of the many other authorities that sustain this position. Nor can it be said that this company has acquired any rights by estoppel, or by being permitted to occupy the streets for so many years, for, as is abundantly shown by the authorities, cited by Mr. Justice Hill, no right can be created by use or estoppel against a municipal corporation, unless the municipal corporation had power to grant the right in the first instance.

The question of the ownership of the sewer pipes is not in this action. That issue is involved only in

the *quo warranto* action. It can and should be determined there, and if determined in favor of the sewer company, the court in that action can and should afford to the company ample protection; so that it may lawfully remove its pipes, or otherwise lawfully dispose of them. It is conceded by all that the company can dig up the streets and alleys only under the supervision and regulation of the city. If this is so, it is right to say that pending the determination of the *quo warranto* action the company shall not dig up the streets and alleys, except under the regulation and supervision of the city. As it is made to manifestly appear that under the protection and judgment of the court below, the company will endanger the public health by disconnecting users of its system who fail to pay its charges, it should be restrained from making these disconnections, it appearing that the law affords another and ample remedy to the company to collect all lawful charges. In addition, it appears, that under the law of this state the company has no right to operate a sewer and collect charges for sewer service, or to dig up the streets, or alleys to compel the payment of charges, therefore, no rights of the company are at all interfered with by restraining it from digging up the streets for the purpose of making disconnections. Finally, for as much as all matters in controversy cannot be settled in this action, but some must be determined in the *quo warranto* action, it accords with good sense and sound morals, and inures to the preservation of the peace, welfare and health of the inhabitants of the city of Leadville to preserve matters in *statu quo,* as designed by the judgment of this court, until all matters in controversy can be finally determined, and put at rest. Much illogical reasoning, great use of opprobrious terms, such as confiscation, municipal dishonesty, and the like; assumed hypotheses, and

seemingly righteous expressions, are indulged in by
those who assail the judgment of this court. Such
things have no effect, beyond the hollowness of their
own sound. Valid rights need nôt be bottomed on
assumed hypotheses, supported by illogical reason-
ing, anchored by opprobrious terms, or surrounded
by the halo of seemingly righteous expressions.
Such things only cause to appear lawful that which
is unlawful. On behalf of the sewer company, it is
said that to prevent it from disconnecting the users
of its system, deprives it of the power to enforce its
contracts with its patrons, and is confiscation pure
and simple. To say that, is to admit that these con-
tracts cannot be enforced at law. I have yet to learn
that the courts of this state will refuse to any of its
inhabitants the enforcement of any lawful contract.
If the company cannot enforce its charges, save by
disconnecting, it is because its charges are unlawful,
and made in the operation of an unlawful enterprise.

By the judgment of the lower court, the injunc-
tive power of a court of equity is employed to per-
mit this company to enforce unlawful contracts, and
collect unlawful charges, by the strong arm of might,
which contracts it cannot enforce, and which charges
it cannot collect in a court of law. This is beyond
and without the law. It is anarchy pure and simple.
No claim that the company has valid rights is made
in defense of the judgment of the court below. As
we have seen, the very argument of its defenders
shows that it is indefensible, for it assumes that
which is without the law. The law itself, all the
rights of Leadville, the peace, welfare and health of
its inhabitants, it is said, should give way to enable
this company to unlawfully enforce unlawful con-
tracts. Much is also said about the investment of
money by the sewer company. A sufficient answer
to that is, that he who invests his money in the hazard

of an enterprise that is not supported by the law, must not be heard to complain when the law arrests that enterprise. Courts of equity should ever, when necessary, be quick to protect lawful rights from unlawful invasion, but they should always refuse to give aid and assistance to anything that has not the warrant of law to support it.

Mr. JUSTICE GABBERT dissenting:

I cannot assent to the judgment ordered. In the first place, the appeal should be dismissed. The judgment or order appealed from is purely interlocutory. It recites that it should not in any manner interfere with the *quo warranto* proceeding, or the adjudication of the rights of the parties in that action. Its effect is merely to enjoin the city authorities from committing the acts which the judgment inhibits, until judgment is rendered in that proceeding, determining the rights of the parties to the subject-matter of controversy, so that if it is erroneous or not justified under the pleadings and evidence, then it can only be reviewed by virtue of the express provisions of our civil code, and the repeated decisions of this court, in connection with the final judgment which may be rendered in the *quo warranto* action.

It is said in the main opinion that the judgment is final because the parties to it are different from those in the *quo warranto* suit, and according to the language of the judgment it is to remain in force forever, with the proviso that it shall not be taken to in any manner interfere with the trial, or the adjudication of rights as between the parties in the *quo warranto* suit. It certainly is not final, because its purpose is merely to preserve the *status quo* until the final disposition of the *quo warranto* action.

(10)

When that proceeding is finally disposed of the judgment here on review will have served its purpose, and will no longer have any force or effect. To say that the parties to it are different for the purpose of distinguishing it from the *quo warranto* suit is merely making a distinction without a difference. In the *quo warranto* suit the action is on behalf of the city of Leadville. Its mayor is the relator. In the action at bar, the city is the real party in interest, and the individuals made defendants were made so because they were assuming to act on behalf of the city in committing the wrongful acts which it was the purpose of the action to inhibit.

It is asserted in the main opinion that the judgment appealed from is final because the plaintiff did not mention in its complaint the existence of the *quo warranto* suit; and further, that if it was intended that the judgment demanded was to be interlocutory only, the sewer company should have requested the court to have made the parties to this action parties to the *quo warranto* suit. If the complaint filed by the sewer company was defective because of its failure to mention the existence of the *quo warranto* action, that defect was cured by the answer filed on behalf of the defendants, wherein the existence of the *quo warranto* proceedings was averred. It is settled beyond dispute, that a pleading defective for failure to aver some necessary fact may be cured by the pleading on the other side. That was what was done here. So far as the parties are concerned the real party in interest, the city of Leadville, was before the court in both actions, and the additional parties in the case at bar are those who claimed to represent the city in their official capacity, when they committed the wrongs of which the plaintiff company complained.

If, however, we review the case upon its merits,

the judgment of the district court is right, and the one directed by this court is wrong, because it sets the seal of approval on municipal dishonesty; it sanctions the confiscation and taking of property without due process of law; it grants a municipality rights to which it is not entitled; it promulgates the doctrine that the commission of a wrong creates a cause of action in favor of the wrong-doer. It refuses protection to property rights which it is clear should be protected; it imposes a burden upon the sewer company to keep its plant in repair, but denies it the privilege of enforcing its rights against persons connected with the system who refuse to pay. For these reasons and many others which might be advanced, the judgment ordered by this court is unjust; and has neither reason, logic, law nor facts to support it when the record is examined and the undisputed facts in the case are disclosed.

In 1886 the sewer company applied to the council for permission to lay sewer pipes in the streets and alleys of the city. The records of the council show that the application was granted. Thereafter, at three different times, namely, in 1888, 1890 and 1891, it appears from the records of the city council that permission was granted the sewer company to extend its system. Property owners along and adjacent to the system connected therewith, under contracts providing stipulated rates, by virtue of which the company reserved the implied right to disconnect those in default, or who refused to pay for the use of the system. This statement; that the company had the right to disconnect users in such circumstances is made advisedly. By operation of law the sewer company would have the right to disconnect those who were in default, or refused to pay, just as an electric light or gas or water company, when they connect a consumer with their system for the purpose

of furnishing light, heat, or water, at a stipulated rate, have the right to disconnect those who refuse to pay for the services rendered, or a grocer who has agreed to extend a customer credit for provisions purchased, with the understanding that he shall pay at stipulated times, may refuse further credit if the customer is in default, or refuses to pay the bills which he has contracted.

The city, by ordinance, prescribed the conditions under which the company might excavate in the streets for the purpose of extending, maintaining and repairing its system, and making connections and disconnections, so as to protect the streets from unnecessary injury, and for the purpose of keeping them in repair. For the period of twenty-two years the company operated its system without objection, let or hindrance on the part of the city. During this period the record does not disclose that there was any complaint by patrons of the system regarding the rates, or its efficiency. In February, 1908, the council passed a resolution whereby it purported to revoke all permits and licenses granted the sewer company, inhibited it from making any excavations for any purpose whatever, decreed that it should not be permitted to charge any one for sewer service, and declared that it did not recognize in any manner any rights of the company to its sewer system, or to charge for its use. No excuse was offered for this extraordinary action, but it was an attempt on the part of the city, pure and simple, to confiscate and take over the property of the sewer company, without offering any reason therefor, or any claim that it was legal to do so.

Immediately upon the passage of this resolution the city, through its mayor and members of the council, notified persons whose property was connected with the sewer not to pay the company any charges

for its use, and that the city, through its police force, would prevent the company from disconnecting the laterals of users with the sewer mains, and would cause the arrest and imprisonment of anyone who undertook to excavate in the streets for the purpose of disconnecting those who refused to pay. A few weeks after this most extraordinary attempt on the part of the city to determine for itself the rights of the sewer company, and the action of the city officials in assuming the authority to arrest anyone who might excavate in the streets for the purpose of disconnecting the laterals of users who refused to pay for the use of the system, a stoppage occurred. The company took steps to put the system in order. The city, through its police officers, at once prevented the company from making the needed repairs, but magnanimously offered to make them if the company would furnish the material and pay for the labor. The company refused to accept the proposition, and the sewer was repaired by the city. From that time the attitude and action of the city officials was such that the sewer company, by force, was ousted of all control and possession of its system, by being prevented from repairing it, or connecting or disconnecting therewith, or making any excavations in the streets, for any purpose. Confronted by this lawless action of the city authorities, the company applied to the district court for an injunction to restrain the city from further interfering with it. On a full hearing the facts, even much stronger than above stated, were not only established by the admissions of the defendants in their pleadings, but by testimony which was undisputed. The court rendered judgment granting the relief prayed for, and enjoining the city from in any manner interfering with the company in maintaining and operating its system, with respect to repairing it, or disconnecting or con-

necting therewith, in accordance with its rules and regulations, with the proviso that the company, in maintaining and operating its system, and in excavating in the streets, should observe the rules and regulations of the city as to danger signals, and as provided by ordinances regulating the conditions under which such excavations should be made.

That this judgment was right under the established facts cannot be doubted. In order to reach this conclusion, it is not necessary to resort to precedent, statute, or maxim. The facts speak for themselves, and irresistibly lead to the conclusion that the judgment of the district court could not have been otherwise. All judgments, though formulated under rules of law, are based upon the one proposition, that they are right and just, as distinguished from that which is wrong and unjust, when tested by the facts upon which the judgment is based. This court has modified that judgment by directing one to the effect that the city be restrained from taking possession of the sewer system, for the purpose of operating it, or in any manner interfering with the company in its operation, except so far as it may be necessary to protect the public health, and that the sewer company be enjoined from disconnecting any user of the sewer for the purpose of enforcing collections for its use, but it is permitted to make excavations where necessary to repair, maintain and preserve the system. The injunction thus directed, as to both parties, is to remain in force and effect until their rights in the subject-matter of controversy be finally determined in the *quo warranto* proceedings now pending, or in some other appropriate action. The fact that the judgment here directed is only to remain in force and effect until the *quo warranto* case is decided, demonstrates that the one now being considered on appeal is only interlocutory, for when that case is

decided, the judgment directed by this court will cease to have any force or effect thereafter. In short, the judgment here ordered is nothing more or less than interlocutory, because it reviews and modifies one which was purely of that character.

The judgment here demanded by the city, namely, that the injunction be dissolved *in toto* and the complaint dismissed, which would permit it, until the rights of both parties are determined in some appropriate action, to enforce its remarkable fiat as contained in the resolution, by assuming to fix the rights of all parties to the subject of controversy, is more nearly in consonance with justice, unjust as it would be, than the judgment directed by this court. Notwithstanding its lawless action, and the results which would follow the judgment demanded by the city, the latter seems to still have a sufficient sense of justice remaining to realize that if it enforces its fiat, the burden of maintaining and keeping in repair the sewer system would devolve upon the city. This would relieve the sewer company from all expense and responsibility. The judgment of this court inhibits the city from interfering with the company in maintaining and keeping its system in repair as a going plant, thus casting upon it the burden and responsibility of keeping it in proper repair, but at the same time says it shall not enjoy the fruits of the burden thus imposed, by disconnecting those who refuse to pay for the use of the sewers, although they may be entirely irresponsible, and the company has the right under the contracts with those connected with the system to disconnect such as are in default or who refuse to pay; but must maintain at its own expense a sewer system for the use of those who will not pay, and can never be made to pay; in short, a utility corporation is required to maintain its system at its own expense, but is denied the privilege of

collecting any revenue by the enforcement of its contracts in so far as they relate to disconnections. This result, so manifestly unjust, springing, as it does, from the judgment of the highest tribunal in this state, is certainly to be regretted. Figuratively speaking, the sewer company came into court asking for the loaf of bread to which it was clearly entitled, and this court has assumed to answer its prayer by handing it a stone. There is no half-way line defining the rights of the litigants in the subject-matter of controversy. They are not jointly interested in it. The company is entitled to control its property, absolutely, until its rights are determined in a court of law, or it has none whatever to protect. Notwithstanding this situation, this court has assumed, with neither facts, law, nor logic to support it, to direct a judgment which imposes upon the company the burden of maintaining its system, but deprives it of the right to enforce collections for its use, by enforcing its contracts with those enjoying the use of the system, by inhibiting it from disconnecting users who refuse to pay. This result is confiscation, pure and simple.

The city, through its police, had the physical power to, and did, enforce the fiat of its resolution. Against this force there was no recourse for the company unless it also violated the law, except to appeal to a court of equity. Courts of equity have no power to extend immunity to municipal dishonesty, nor can they recognize that a municipality can commit acts of lawlessness with impunity, or deprive owners of property of their rights therein, without due process of law. These plain and simple propositions have not only been violated by the judgment of the majority of this court, but thereby a premium has been placed upon municipal dishonesty, and in effect it is determined that rights may be acquired by municipal

corporations through acts of lawlessness; that it may deprive owners of property of their rights without due process of law; and, in addition, there has been engrafted upon the jurisprudence of this state the proposition that "Might makes Right."

Let us see if there is any reason given in the opinion justifying such results. Facts are stated which are not material unless they are intended to justify the judgment directed by this court. It is said that the *quo warranto* action instituted in March, 1908, is still pending and undetermined, and that it is to be regretted that it was not disposed of at an early date. Who is responsible for this condition of affairs and delay? The presiding judge of the district court was disqualified because of his interest in the subject-matter of controversy. He arranged for a judge from another district to hear and determine the case. It appears that in June, 1908, a time was fixed when an outside judge could be present. Counsel for the city, however, shortly before the date fixed, notified the judge of the district that it would not be convenient for him to take up the case at the time agreed upon, because of other matters to which he wished to devote his attention, although they were not of a professional character.

No attempt, however, will be made to notice or restate the many statements of fact in the opinion which have no bearing whatever on the vital question involved; neither will it be of any assistance to notice in detail the proposition assigned in support of the judgment directed, or the authorities cited in connection therewith which have no bearing on any question here presented for determination; but the judgment below, and the one directed here, will be tested by the facts established in the trial court under the issues made by the pleadings. These are the only sources which can be resorted to for the purpose

of testing a judgment brought to this court for review.

As previously stated, the sewer company, by express permission, and with the acquiescence of the city authorities, laid its sewer system in the streets of the city, and from time to time extended it, and for twenty-two years operated it, without any objection on the part of the city; that then the latter passed a resolution whereby it attempted to revoke all permits and licenses granted the sewer company, inhibited it from making any excavations in the streets for any purpose, and undertook to decree that it should not be permitted to charge anyone for sewer service, and that upon the passage of this resolution, the city, through its mayor and members of the council, notified persons whose property was connected with the sewer not to pay the company any charges for its use, and that through its police force, it would prevent the company from disconnecting the laterals of users with the sewer mains, and would cause the arrest and imprisonment of anyone who undertook to excavate in the streets for the purpose of disconnecting those who refused to pay.

It is also an undisputed fact that when the sewer company did undertake to repair its system, it was prevented from doing so by the officers of the city, and that from that time forward the attitude and action of the city officials was such that the sewer company, by force, was ousted of all control and possession of its system.

These are the main facts alleged in the complaint filed by the sewer company, for the purpose of obtaining a judgment which would protect it in its rights. Let us see what defenses the city interposed to this action, as disclosed by its answer. It copied and made a part of its answer the averments of the complaint in the *quo warranto* suit, wherein it was

stated: "That on said third day of August, 1886, the city council of the said city of Leadville passed a resolution purporting to grant said permit, but relators say that the said city council was without power or authority to grant said permit, and that the same was and is wholly void and of no force or effect."

It then sets out the resolution passed by the city council in February, 1908, heretofore referred to, and admits that sewers were constructed by the company by virtue of the permission granted in August, 1886; but avers that because such permit was beyond the authority of the city authorities to grant, "the said sewers and every part thereof as soon as constructed became, were and now are a part of the public highways, streets, alleys, public ways and places of the said City of Leadville, and as such became, were, and now are the property of the said City of Leadville and of the inhabitants thereof." In other words, the claim is made boldly on behalf of the city, that although by its express permission it induced the sewer company to place its system in the streets and alleys of the city, the system became, as soon as constructed, the property of the city, because it had no authority to grant such permission. Its effect is to assert that a municipality can be dishonest, and may, in its transactions which are purely of a business nature, obtain property by false pretenses. If such a conclusion of law is deducible from the facts averred, and city officials can be found sufficiently dishonest to secure property for a city in this way, then a method has been pointed out whereby the municipalities of this state, by being dishonest, can secure public utilities to be placed in the streets without any expense to them, and when so placed, they become the property of the municipality.

Again it is averred, in the *quo warranto* complaint: ''That the defendants have charged and collected from the inhabitants of the said City of Leadville, along whose property said sewer or the extensions run, the cost, or a great part of the cost of constructing and building said sewers and the extensions thereof, so that, in equity and good conscience, the said sewers and the extensions thereof belong now to the inhabitants of said the City of Leadville, freed from any burden of tolls or other charges to said defendants or either or any of them.''

It is also alleged in the answer: ''That the charges so made have been exorbitant and have many times over paid the cost of construction of said sewers, together with reasonable interest charges thereon, and the expense of maintaining and operating the same, and that the real owners of said sewers are the citizens whose property has been connected therewith, and who have made payment of the rate aforesaid.''

Further it is averred in the answer that because the returns from the investment of the sewer company have paid for the system, ''that said sewers are public property, freed from any claim or demand from the plaintiff.''

In the prayer to the complaint in the *quo warranto* case it is asked ''that it be declared that the sewers mentioned in the complaint and all and every thereof, whether specifically named or not, be, and the same are, the property of the City of Leadville, for the use and benefit of the inhabitants thereof, freed from any claim or demand of defendants, or any or either of them.''

''Equity and good conscience'' is an elastic expression, and has often been applied in adjudicating the rights of parties, but so far as advised, this court is the first one to recognize that ''in equity and good

conscience" a party may be deprived of his property without due process of law, and that "in equity and good conscience" it may be confiscated. Such a doctrine means that if a merchant has been successful in building up a business, has made it profitable, and accumulated a large stock as the result of his efforts, so that the original capital invested has been returned, then, "in equity and good conscience" his stock can be confiscated. It means that the farmer who has taken a piece of wild land, cultivated and improved it, and thus' enhanced its value, and has, perhaps, received from crops raised and harvested much more than was originally invested, is liable, "in equity and good conscience" to have his property confiscated. In short, if the defense under consideration is good, the property of any successful business enterprise is subject to confiscation. True, it may not be plain as yet in whose favor the confiscation should be made in such circumstances, but if the doctrine once obtains that one who has made a success of his business by realizing returns in excess of the amount originally invested and perhaps has accumulated a fortune through his efforts and business energy, is liable to have his property confiscated for this reason, it will not be difficult to invent a beneficiary to whom the property can be turned over.

The above are the facts and the issues presented to the court below and upon which the judgment of this court must be based, for there were no others presented to the trial court. It must be apparent, then, that the judgment here is predicated upon the ground that, because the city had no authority to grant the sewer company the right to occupy the streets of the city, and now having repudiated its grant, it has become the owner of the property which by its conduct it induced the sewer company to place in the streets; or it must be predicated upon the

proposition that because the sewer company has realized returns from its investment sufficient to reimburse its original outlay, that, therefore, "in equity and good conscience," the property of the sewer company has now become the property of the city, or of those who paid tolls for the services rendered them. In short, the judgment directed by this court must be based upon the admitted dishonest action of the city or upon the theory of confiscation, as set up in the answer, or both, for no other defenses have been interposed. This is not conjecture. The opinion itself discloses that these defenses influenced the court in reaching the conclusion it has. They are noticed, and it is said, in effect, that an injunction should not be issued against a municipal corporation, except in actions free from doubt, and then only in an extreme and exceptional case. So it is apparent that the court must have reached the conclusion that by these defenses such a doubt was raised regarding the rights of the sewer company as justified the order inhibiting it from disconnecting users of the system who refused to pay; but these defenses are not tenable. Should it be determined in the *quo warranto* action that the sewer company has no right to longer occupy the streets, because the city had no authority in the first instance to grant such right, or that the right to occupy has expired, or if for any reason it should be determined that the sewer company had no right to longer occupy the streets, the physical structure would be the property of the company, without any right therein, either in the city or anyone else. That proposition needs no citation of authority to support it. No matter, then, what the outcome of the *quo warranto* case may be, the physical structure will remain the property of the sewer company, and it is now the owner of it. Regarding this there cannot be the slightest doubt; and yet, in

the face of the fact that this system is now the property of the sewer company, and must remain such until its title has been divested according to law, this court directs that it shall not be permitted to enforce its contracts by disconnecting those connected with the system who refuse to comply with their agreements; imposes upon it the duty of keeping its system in repair, but.compels it to permit users who will not pay, or are irresponsible, to have the use of the system. In other words, compels the company to keep its system in repair, and operate it for the use of those who can not or will not pay for such use, until the rights of the parties are determined in the *quo warranto* proceedings, although it is plain beyond the shadow of a doubt, that the physical structure of the system is now, and at the conclusion of the *quo warranto* proceedings, will still be, the property of the company. That such results deprive the sewer company of its property and property rights without due process of law is so plain that further discussion is unnecessary.

The remaining proposition, which embraces the other defenses interposed by the city, to the effect that because the sewer company had realized from tolls a sum in excess of the original investment, that therefore its rights in the property had ceased, and that the system "in equity and good conscience" now belongs either to the city of Leadville or to the parties who paid the tolls, is so absurd that it is not worthy of serious consideration.

It is evidently sought to avoid basing the judgment here directed altogether upon the issues made in the court below, by claiming that it is necessary to inhibit the sewer company from disconnecting users who refuse to pay, upon the ground that public health is involved, and would be endangered if those who refuse to pay had their property disconnected from

the system. No such issue was made in the court below. All that was said in the answer on that subject was "that to permit the plaintiff to disconnect such users of the sewer would result in the creation of a nuisance on account of the sewage thus undisposed of remaining upon the premises of such users." It was not claimed that the nuisance thus created could not be abated or would endanger public health. Neither was there any attempt on the part of the city to introduce any testimony on the subject. On the contrary, when the question of the advisability of a sewer system for Leadville at the time when the sewer company applied for permission to place its system in the streets was under discussion at the trial, the necessity for it was derided by counsel for the city. His efforts then were directed entirely to excluding evidence of the permits to the sewer company, and the introduction of testimony to prove the revenue derived from the system, presumably for the purpose of thus establishing that, the permission being without authority, the system was the property of the city, and that from the volume of revenue derived, it was subject to confiscation. No thought of raising any question on the score of public health was ever suggested until after the case reached this court on appeal. Then, for the first time, counsel for the city, unquestionably realizing that under the issues made below the city had no standing whatever, sought to inject that question here by affidavits which the main opinion says have not been controverted. Since when has the practice obtained that an issue of fact going to the merits of a case not made below, can be injected after the case has been removed to this court on appeal, and tried in connection with the review of the case on the record from the trial court?

But, aside from these considerations, the claim

is specious, and, unfortunately, the majority appear
to have regarded it with favor, without realizing its
speciousness.   In the first place, the owner of a sewer
system, even in the interest of public health, cannot
be deprived of his property without due process of
law.   But public health is not involved.   If persons
using the sewer are disconnected, the refuse which
would have been carried off through the sewer will
be lodged upon their premises, but it does not follow
by any means that such lodgment will be anything
more than temporary, or that refuse will remain upon
premises to the detriment of the health of the in-
habitants of the city.   The city is clothed with ample
power to compel persons disconnected from the sewer
to keep their premises, and make provisions for keep-
ing them, in a sanitary condition.   Merely because
citizens who may be disconnected must make some
other provision for keeping their premises in a sani-
tary condition, or that it will be incumbent upon the
city to compel them to do so, is no reason why the
company should be compelled to take care of sewage
for nothing.   If the premises of those who may be
disconnected are not kept in proper sanitary condi-
tion, it is because the city authorities are derelict in
the discharge of their duties.   Clearly, the conten-
tion on the part of the city that public health is in-
volved is a mere subterfuge, because at most it only
appears that citizens who refuse to pay for sewer
service, and by the judgment of this court are
awarded sewer service for nothing, at the expense of
the company, will be compelled to incur some expense
to keep their premises in a sanitary condition, and
the city officials will have imposed upon them the
labor, if they do their duty, of seeing that they do.
This presents no reason why the company should
have imposed upon it the burden of relieving the

(11)

citizens and officials from the burden of discharging their duties.

There is still a potent reason why the city should not be permitted to interfere with the operation of the sewer system. It has no interest therein, either present or future. The contractual relations between the company and its patrons are purely private. The city is not a party to these contracts. It has no more authority to declare that the company should not be permitted to make charges for sewer service than it would have had in an attempt to declare that the merchants of Leadville should furnish their wares to the inhabitants of the city free of charge, and for the purpose of enforcing such an order, had thereafter issued a notice to the effect that, through its officials, it would cause the arrest of any merchant who failed to obey its mandate. On the strength of the resolution it did pass, and its unlawful action thereafter, all of which were palpable wrongs, it has induced users of the system to refuse payment for sewer service which has necessitated the company, as one means of enforcing payment or protecting itself against irresponsible parties, to disconnect those in default. In other words, the commission of wrongs on the part of the city, by intruding itself into affairs where it had no business to intrude, has brought about the necessity for action on the part of the company to protect itself, which the city now seeks to prevent, and on the strength of which it demands that the company be required to furnish sewer service for nothing. The judgment of this court, in so far as it grants relief to the city, is for the purpose of preventing conditions which the wrongful acts of the city are responsible for. This is the first time in the history of the jurisprudence of this country, so far as the writer is advised, where, in effect, it has been declared by a court of last resort

that the commission of a wrong creates a cause of action in favor of the wrong-doer.

Finally, the judgment directed appears to be based upon a desire to preserve the *status quo*. The *status quo* is the state of things at some particular date. It seems that the majority recognize the *status quo* as existing at the time the *quo warranto* proceedings were commenced, which was after the resolution was adopted by the city council, thus giving force and effect to that resolution, by recognizing that at that time, by that unlawful action, a *status quo* was created which should now be continued. A condition through the medium of unlawful action and force cannot create a *status quo* which courts can recognize. The action of the city council gave it no legal rights, neither did it deprive the company of any rights in the subject-matter of controversy. The *status quo* was the condition which existed before the city officials undertook to deprive the company of the ownership, possession, and control of its property. The conditions as they existed prior to that time is what should be protected by injunction until the rights of the litigants are determined in the *quo warranto* proceedings. At that time the sewer company owned, and now owns, the sewer system. Regarding that there can be no question; and the right of the company to control and operate it should be fully protected pending final judgment in the *quo warranto* case. The judgment directed by this court deprives it of that protection. The judgment of the district court afforded it that protection, and should, therefore, if this court has the authority to review it, be affirmed. Under our practice, however, the proper order to enter is one dismissing the appeal.

One further criticism of the opinion is respectfully offered. It disclaims the intention of deter-

mining any question involved in the *quo warranto* proceeding, and yet it is said, in substance, that the city officials had no authority in the first instance to grant the sewer company permission to disconnect users, and, therefore, it is not now estopped from refusing it that right. Both of these questions should be determined in the *quo warranto* action, and not here.

Mr. JUSTICE CAMPBELL concurs in this opinion.

---

Mr. JUSTICE CAMPBELL dissenting:

Upon the original hearing my concurrence in the dissent of Mr. Justice Gabbert was announced. In disposing of the petition for rehearing, in order to make clear my position as to this controversy, the following observations are submitted: To my mind it has been conclusively demonstrated, by the dissenting opinion, that the judgment or order sought to be reviewed is purely interlocutory. In no sense is it now final, whatever it may become hereafter. For this reason alone, the appeal should be dismissed.

There is another and equally conclusive reason therefor. The pending action is equitable in its nature. Disregarding superfluous and immaterial allegations therein, the complaint and the other pleadings show the sole object of plaintiff company was to obtain, and the only relief granted was, an injunction to preserve the *status quo* of the sewer system, ownership of which it claimed and the right to operate which it asserted, while defendant city denied that plaintiff had any license or franchise or right whatever, either of ownership or operation, and proposed, by superior physical force, if necessary, to enforce its contention. These legal rights of the parties could, under the established practice in this

state, be determined only by a proceeding in the nature of *quo warranto*. Such a proceeding, with that object in view, had been instituted by the district attorney, upon the relation of the mayor of Leadville, and was then pending in the district court of Lake county. Notwithstanding the pendency of that action undetermined, the city council, as stated, resolved, and proposed by force, if necessary, through its police department, to take possession and control of the sewer system and exclude the sewer company from it. Such being the situation—it being necessarily assumed by the city in causing this action to be begun that there was a substantial controversy between the parties over property rights—the sewer company brought this equitable suit to restrain the city, during the pendency of the *quo warranto* action, from interfering with its possession and operation of the system. It would seem to any fair-minded person, to the lay as well as to the legal mind, that it was the duty of a court of equity to protect a litigant in its claimed right of property, which for many years had been recognized and acquiesced in by the city, until, in the legal action, a court of competent jurisdiction determined that plaintiff had no rights, or had lost those which it once had. The legal rights of the litigants ought not to be discussed, or inquired into, on this review, except only in so far as necessary to ascertain if there was a substantial controversy over property rights, and, it would seem, they have not been expressly passed upon by a majority of the court. Speaking for myself and also Mr. Justice Gabbert, it is fitting to say that they would not have been considered by us, had not the opinion of Mr. Justice Hill, which we then thought was to be the opinion of the majority, though disclaiming an intention to pass upon them, proceeded with their discussion and an announcement of his opinion on at least

some of the important questions involved in the *quo warranto* action.

I agree with Mr. Justice White and Mr. Justice Bailey that these legal rights ought not to be, and cannot be, in accordance with our fixed practice, determined in this equitable action; but I dissent from their conclusion and from that of the other members of the court, whose views are set forth in the opinion of Mr. Justice Hill, in modifying the injunction. So far as my investigation has gone, it is an unprecedented thing to allow an issue, not raised or decided below, to be presented for the first time on review, as, in this cause, the question of public health, when there has been no opportunity for the trial court to pass, or for the parties to be heard upon it, and for an appellate court on final hearing to predicate its ruling thereon. Without prolonging the opinion, it is enough to say that, in my judgment, upon the clearest and plainest equitable principles, this appeal should be dismissed and the judgment of the district court left standing exactly as it was pronounced.

Announced Dec. 6, A. D. 1909; rehearing denied March 7, A. D. 1910.